# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

_____ X
: 
In re: :
:
THE FINANCIAL OVERSIGHT AND : PROMESA
MANAGEMENT BOARD FOR PUERTO RICO, : Title III
:
as representative of : Case No. 17-BK-3283 (LTS)
:
THE COMMONWEALTH OF PUERTO RICO *et al.*, : (Jointly Administered)
:
Debtors.[1] :
_____ X
:
THE SPECIAL CLAIMS COMMITTEE OF THE :
FINANCIAL OVERSIGHT AND :
MANAGEMENT BOARD FOR PUERTO RICO, :
ACTING BY AND THROUGH ITS MEMBERS, : Adv. Proc. No. _____
:
and :
:
THE OFFICIAL COMMITTEE OF UNSECURED :
CREDITORS OF THE COMMONWEALTH OF :
PUERTO RICO, :
:
as co-trustees respectively, of :
:
THE COMMONWEALTH OF PUERTO RICO *et al.*, :
:
Plaintiffs,[2] :
:
v. :
:

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747).

[2] The members of the Special Claims Committee, on the one hand, and the Official Committee of Unsecured Creditors, on the other hand, serve as co-trustees and co-plaintiffs in the prosecution of this adversary proceeding as described in that certain *Stipulation And Agreed Order By And Among Financial Oversight And Management Board, Its Special Claims Committee, And Official Committee Of Unsecured Creditors Related To Joint Prosecution Of Debtor Causes Of Action,* Case No. 17-BK-3283 (LTS), ECF No. 6501-1, which is referenced herein to the extent necessary and appropriate.

BNY Mellon/POP Sec, *et al*,[3]                                    :
                                                                  :
                    Defendants.                                   :
_____   X

### ADVERSARY COMPLAINT TO AVOID AND RECOVER
### FRAUDULENT TRANSFERS AND TO DISALLOW CLAIMS
### <u>PURSUANT TO 11 U.S.C. §§ 502, 544, 548, AND 550 AND PUERTO RICO LAW</u>

Pursuant to (i) Federal Rules of Bankruptcy Procedure 7001(1) and (9), made applicable to these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act (48 U.S.C. § 2170) ("<u>PROMESA</u>"), and the *Stipulation and Agreed Order By and Among Financial Oversight and Management Board, Its Special Claims Committee, and Official Committee of Unsecured Creditors Related to Joint Prosecution of Debtor Causes of Action* [ECF No. 6501-1],  (i) the Special Claims Committee (the "<u>SCC</u>") of the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"), acting by and through its members, as representative of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), and (ii) the Official Committee of Unsecured Creditors of all title III Debtors (except COFINA) (the "<u>Committee</u>"), in each case by and through undersigned counsel,[4] alleges on actual knowledge as to its own status and actions and upon information and belief as to all other matters as follows:

### <u>NATURE OF PROCEEDING</u>

1.      This action arises from the Commonwealth's issuance of approximately $9 billion dollars ($9,000,000,000) in general obligation bonds in violation of the Constitution and statutes of Puerto Rico.[5]  The Plaintiffs, on behalf of the Commonwealth, ask the Court to recognize that

---

[3] A list of defendants is attached hereto at <u>Appendix 3</u>.  *See also* ¶8.

[4] The Plaintiffs first learned the identities of hundreds of the defendants in this action less than twenty-four hours before the filing of the Complaint.  Despite its best efforts, the Committee's counsel did not have the opportunity to finish a comprehensive conflicts review with respect to all defendants.  The Committee's counsel reserves the right to withdraw from this action as to certain defendants without prejudice to Plaintiffs if necessary to resolve any conflicts that may arise.

[5] All terms capitalized in this section shall have the meaning ascribed to them below.

the laws of Puerto Rico do not authorize such debts and that the Commonwealth is entitled to recover property unlawfully transferred on account of purported principal and interest payment obligations, so that such property may inure to the benefit of Puerto Rico's citizens, taxpayers, and legitimate creditors.

2.      The Commonwealth declared at the time it issued the Challenged Bonds that it was in compliance with a constitutional provision limiting general obligation indebtedness to a proportion of its historical internal revenues.  In performing this calculation, however, the Commonwealth and various professionals and lenders, however, ignored approximately billions of dollars in PBA Bond debt, which publicly available documents reveal to be transparently general obligations of the Commonwealth in purpose and effect.  Accounting for these PBA Bonds (and even regardless of the PBA Bonds, to some extent), the Challenged Bonds violated the constitutional debt limit.

3.      These infirmities in the Challenged Bonds render them legal nullities.  As a consequence, any amounts paid by the Commonwealth on account of such purported bonds (i) were *per se* unlawful and recoverable under Puerto Rico law, and (ii) are avoidable as fraudulent transfers pursuant to the Bankruptcy Code and Puerto Rico law.

4.      The Plaintiffs understand the unusual nature of this action and the significance of the relief they are requesting.  In particular, the Plaintiffs acknowledge that the Commonwealth did receive certain purported bond proceeds, and some purported bondholders may have relied upon legal opinions and disclosures of purported facts by the issuers, underwriters, and other professionals and lenders as to the purported propriety of the issuances.  While the Plaintiffs are sympathetic to these concerns, the laws of Puerto Rico limit government borrowing authority for a reason: to prevent the government and its financiers from hitching the Commonwealth and its

instrumentalities, as well as taxpayers and legitimate creditors, to a level of debt that cannot be repaid without sacrificing services necessary to maintain the health, safety, and welfare of Puerto Rico and its people.  These Title III cases are evidence, *per se*, of the government, and its financiers, failing in such obligations to themselves, taxpayers, and legitimate creditors.

5.      It would not be equitable, or legal, to ask the taxpayers and legitimate creditors of Puerto Rico to bear a burden from which they are protected by their own constitution and statutes.  That burden should instead be shouldered by those who, knowing of Puerto Rico's increasingly dire financial crisis, chose to lend to Puerto Rico or purchase Puerto Rico debt that carried high effective interest rates as a reflection of risk.

## **PARTIES**

6.      Co-Plaintiff the Oversight Board (acting through the members of its Special Claims Committee) was established by PROMESA to help Puerto Rico "achieve fiscal responsibility and access to the capital markets."  PROMESA § 101(a).  The Oversight Board "is the representative of the debtor" in any Title III case, and the term "trustee" under title 11 of the United States Code (the "Bankruptcy Code") as incorporated into PROMESA means the Oversight Board.  PROMESA §§ 301, 315.

7.      Co-Plaintiff the Committee is the Official Committee of Unsecured Creditors of the Title III Debtors, other than COFINA.  The Committee was appointed by the United States Trustee on June 15, 2017.

8.      The above-captioned defendants (the "Defendants") whose names and addresses of record are provided at Appendix 3 to this Complaint, are persons who received payments from the Commonwealth on account of purported principal and interest obligations relating to certain purported general obligation bonds described herein.  As permitted by the *Further Order Pursuant to Bankruptcy Rules 1007(i) and 2004 Authorizing Discovery and Compelling*

*Disclosure of Lists of Security Holders* [Case No. 17-03283, ECF No. 6493] (the "Confidentiality Order"), at ¶3(b), certain defendants to this adversary proceeding (a "Challenged Bond Avoidance Action" as defined in the Confidentiality Order and related documents) are identified in this initial pleading by pseudonym, and a "key" will be filed under seal contemporaneously  that will match pseudonyms to actual names.  Defendants are hereby advised that the Confidentiality Order further provides that "the obligation to utilize a pseudonym as provided herein extends only to the initial pleading and case commencement materials and shall terminate twenty-one (21) days after the [Plaintiffs] provide[] such defendant, at the time of service, with reasonable notice and an opportunity to object to the use of its Confidential Information," which includes all Defendants' real names.  Furthermore, "notice and opportunity...may be provided by [Plaintiffs] in the body of any initial pleading and no further notice shall be required."   Accordingly, this paragraph shall satisfy all notice requirements pursuant to the Confidentiality Order, and Defendants are deemed provided an opportunity to object to use of Confidential Information upon service of this Complaint.

## JURISDICTION AND VENUE

9.      This is an adversary proceeding brought pursuant to Federal Rule of Bankruptcy Procedure 7001 and sections 105(a), 544, 548, and 550 of the Bankruptcy Code to recover money for the Commonwealth.

10.     An actual and justiciable controversy exists between the Plaintiff and Defendants. Section 2201(a) of title 28 of the United States Code provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

11.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to section 306(a) of PROMESA.  48 U.S.C. § 2166(a).

12.     Venue is proper in this district pursuant to section 307(a) of PROMESA.  48 U.S.C. § 2167(a).

## BACKGROUND

### I.      The Commonwealth Issued the Challenged GO Bonds Beginning in 2011.

13.     The Plaintiffs incorporate by reference herein all factual statements in the *Omnibus Objection Of (I) Financial Oversight And Management Board, Acting Through Its Special Claims Committee, And (II) Official Committee Of Unsecured Creditors, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of Certain Commonwealth General Obligation Bonds* [ECF No. 4784] (the "Joint Claim Objection"), ¶¶12-132.

14.     A general obligation bond is a bond that is backed by the issuing entity's full faith and credit (which generally includes its taxing power) rather than revenues from any particular source.  *See* Barron's Dictionary of Finance and Investment Terms (10th Ed. 2018) (defining "general obligation bond").

15.     As of May 3, 2017 (the "Petition Date"), the Commonwealth had issued approximately $13 billion in general obligation bonds that remained outstanding.

16.     The Commonwealth's general obligation bonds included the bonds listed below (the "Challenged GO Bonds").[6]

---

[6] The Objectors reserved their rights in the Joint Claim Objection "to raise additional objections to the validity of other issuances of GO bonds, including on the basis that such bonds were issued in violation of the Debt Service Limit, whether because certain other debt was not properly included in the Debt Service Limit calculation or otherwise." Joint Claim Objection at ¶ 11. Accordingly, the Plaintiffs include herein out of an abundance of caution additional issuances of GO bonds (i.e., the Challenged GO Bonds issued in 2011) in the event that the Plaintiffs may, at a later date, object to the validity of such bonds. In any event, these earlier GO bond issuances are the subject of the pending *Omnibus Conditional Objection of the Ad Hoc*

17.     On March 17, 2011, the Commonwealth issued $442,015,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2011 C (General Obligation Bonds) (the "2011 C GO Bonds"). Exhibit A, Official Statement, dated March 10, 2011, for Series 2011 C GO Bonds.

18.     On July 12, 2011, the Commonwealth issued $304,000,000 in aggregate principal amount of Public Improvement Bonds of 2011 (General Obligation Bonds) (the "2011 Public Improvement GO Bonds"). Exhibit B, Supplement Dated July 11, 2011 and Official Statement, dated June 29, 2011, for 2011 Public Improvement GO Bonds, Series 2011 D GO Bonds (defined below), and Series 2011 E GO Bonds (defined below).

19.     On July 12, 2011, the Commonwealth issued $52,190,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2011 D (General Obligation Bonds) (the "2011 D GO Bonds") and $245,915,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2011 E (General Obligation Bonds) (the "2011 E GO Bonds"). *Id.*

20.     On April 3, 2012, the Commonwealth issued $2,318,190,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2012 A (General Obligation Bonds) (the "2012 A GO Bonds").  Exhibit C, Official Statement, dated March 7, 2012, for Series 2012 A GO Bonds.

21.     On March 29, 2012, the Commonwealth issued $415,270,000 in aggregate principal amount of Public Improvement Refunding Bonds, Series 2012 B (General Obligation Bonds) (the "2012 B GO Bonds"). Exhibit D, Official Statement, dated March 7, 2012, for Series 2012 B GO Bonds.

---

*Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligations Bonds* [ECF No. 6099].

22.     On March 17, 2014, the Commonwealth issued $3,500,000,000 in aggregate principal amount of General Obligation Bonds of 2014, Series A (the "2014 GO Bonds"). Exhibit E, Official Statement, dated March 11, 2014, for Series 2014 GO Bonds (defined below).

## II.     Like the Challenged GO Bonds, the PBA Bonds Are "General Obligations" of the Commonwealth.

23.     The Plaintiffs incorporate herein by reference the statements of fact articulated in the Complaint filed in *The Financial Oversight & Management Board for Puerto Rico, et al. v. Puerto Rico Buildings Authority* [Adv. Proc. No. 18-00149-LTS, ECF No. 1] (the "PBA Complaint"), ¶¶14-35.

### A.     The PBA Has Issued Approximately $4 Billion in PBA Bonds Backed by Purported Leases.

24.     The Puerto Rico Public Buildings Authority ("PBA") is an instrumentality of the Commonwealth created by Act No. 56 Puerto Rico Legislative Assembly (as amended and codified at 22 L.P.R.A. §§ 901 *et seq.*, "Act 56").

25.     Pursuant to Act 56, PBA was authorized to (a) issue certain bonds ("PBA Bonds") to finance construction of facilities for government use, and (b) enter into purported leases ("PBA Leases") for the purported purposes of leasing its facilities to provide a source of payment for PBA Bonds.  22 L.P.R.A. §§ 906, 907, 916.

26.     PBA issued multiple series of PBA Bonds pursuant to certain bond resolutions, including: (i) Resolution No. 77, adopted on November 16, 1970 (the "1970 Bond Resolution"); (ii) Resolution No. 468, adopted on June 22, 1995 (the "1995 Bond Resolution;" together with the 1970 Bond Resolution, the "Bond Resolutions"), as supplemented by separate resolutions authorizing the issuance of each series of PBA Bonds under the 1995 Bond Resolution, including without limitation, (a) Resolution No. 1596, adopted on August 10, 2011, authorizing the issuance of the PBA Government Facilities Revenue Bonds, Series R , and (b) Resolution No.

1618, adopted on December 19, 2011, authorizing the issuance of the PBA Government Facilities Revenue Bonds, Series T.

27.     On August 24, 2011, the PBA issued $756,449,000 in aggregate principal amount Government Facilities Revenue Bonds, Series R ("Series R"). Exhibit F, Official Statement, dated August 10, 2011, for Series R.

28.     On August 24, 2011, the PBA issued $303,945,000 in aggregate principal amount Government Facilities Revenue Bonds, Series S ("Series S").  Exhibit G, Official Statement, dated August 10, 2011, for Series S.

29.     On December 22, 2011, the PBA issued $121,528,000 in aggregate principal amount Government Facilities Revenue Bonds, Series T ("Series T").  Exhibit H, Official Statement, dated December 19, 2011, for Series T.

30.     On June 21, 2012, the PBA issued $582,345,000 in aggregate principal amount Government Facilities Revenue Bonds, Series U ("Series U;" together with Series R, Series S, and Series T, and the Challenged GO Bonds, the "Challenged Bonds").  Exhibit I, Official Statement, dated June 8, 2012, for Series U.

31.     As of February 2017, PBA had approximately $4 billion in aggregate principal amount of bonds outstanding under the Bond Resolutions (including bond series in addition to those described above).

> **B.     The PBA Ignores Purported Rental Obligations and Obtains Revenue Directly from the Commonwealth.**

32.     Pursuant to the Enabling Act and the Bond Resolutions, the PBA Bonds are payable from "rent" payments under the PBA Leases, and that "rent" is required to be sufficient, in the aggregate, to pay, when due, the principal of and interest on the PBA Bonds. 22 L.P.R.A. §§ 907(g) and 916; 1995 Bond Resolution §§ 208(c), 701.

33.     Upon information and belief, more than 1,900 PBA Leases are currently in effect, under which aggregate annual "rent" of approximately $401.6 million is payable.

34.     The vast majority of purported lease payment obligations to the PBA are due from the Commonwealth and are to be paid from the Commonwealth's general fund or appropriated funds of its agencies.

35.     Non-Commonwealth entities account for a minimal percentage of purported rental obligations.

36.     As a result, nearly all of PBA's actual revenue collected is sourced from the Commonwealth.

### C.      The PBA Leases Are Not True Leases.

37.     Act 56 requires that Puerto Rico government entities be the lease counterparties on all facility leases, such that the financial obligation on the PBA Bonds shall always remain direct obligations of the Commonwealth and its instrumentalities and municipalities.[7]

38.     Accordingly, many of the Leases are structured as subleases (the "Subleases"), in connection with which, on the same date, and for the same term, (i) the Commonwealth (as owner of the facilities) leased the facilities to PBA for a nominal rent payment of as low as $10 per month, and (ii) PBA subleased the facilities back to a Lessee for "rent" calculated based upon debt service due on the PBA Bonds.

39.     Structured in this way, the Subleases exist for no other reason than to provide a source of payment for debt service on PBA Bonds that finance facilities and/or improvements to facilities already owned by the Commonwealth.

_____

[7]  *See* 22 L.P.R.A. § 903 ("such leases shall be with the Commonwealth or any of the departments, agencies, instrumentalities, authorities, public corporations or municipalities of the Commonwealth of Puerto Rico").

40.     Two examples of Subleases are (i) the Master Sublease Contract, dated as of August 24, 2011, between PBA, as sublessor, and the Commonwealth Department of Education, as sublessee (attached hereto as <u>Exhibit J</u>, the "<u>DOE Series R Lease</u>"), and (ii) the Master Sublease Contract, dated as of December 22, 2011, between PBA, as sublessor, and the Commonwealth Department of Education, as sublessee (attached hereto as <u>Exhibit K</u>, the "<u>DOE Series T Lease</u>").

41.     As required by the Enabling Act and the Bond Resolutions, the "rent" payments under the Leases are specifically designed to cover debt service on the PBA Bonds.  The PBA Leases are simply the mechanism by which the Commonwealth repays the PBA Bonds.

42.     For example, the DOE Series R Lease provides for the payment of "Debt Service Rentals" comprised of "such annual amount or amounts as shall be determined from time to time by the Authority to be necessary to pay the principal of . . . and the interest on all [Series R] Bonds under the [1995] Bond Resolution as the same becomes due and payable." DOE Series R Lease, § 2.01(a).

43.     The DOE Series R Lease further provides that the Debt Service Rental will be adjusted upward or downward, as necessary, depending on whether or not PBA receives certain interest subsidy payments from other sources, decides to issue additional PBA Bonds to finance additional costs of the PBA Facilities subject to the DOE Series R Lease, and/or retires existing Series R Bonds. *Id.* §§ 2.02.

44.     For another example, the Lease Contract, dated March 1, 1997 (attached hereto as Exhibit L, the "<u>Treasury Department Lease</u>"), between PBA, as lessor, and the Treasury Department of the Commonwealth of Puerto Rico, as lessee, provides for the payment of "Debt Service Rentals" comprised of the "Lessee's Proportionate Share" of "such annual amount or

amounts as shall be determined from time to time by [PBA] to be necessary to pay the principal of . . . and the interest on the Bonds [issued under the 1995 Bond Resolution] as the same become due and payable." Treasury Department Lease, § 2.01.

45.     "Lessee's Proportionate Share" is defined in the Treasury Department Lease as "the percentage determined by dividing the cost of the [PBA facilities subject to the Treasury Department Lease] by the cost of all [PBA facilities] payable from the proceeds of all Bonds [issued under the 1995 Bond Resolution]." *Id.*

46.     As a consequence, the lessee Treasury Department of the Commonwealth is required to pay a pro rata share of the principal of and interest on all Bonds issued under the 1995 Bond Resolution.

47.     Moreover, to ensure that the PBA Leases will facilitate full repayment of the PBA Bonds, the term of each lease is set to expire on the maturity date of the PBA Bonds that it supports. *See, e.g.*, DOE Series R Lease, Art. I.

48.     The PBA Leases contain self-restriction provisions designed to ensure that the lessees' payments will never be reduced below the amount necessary to cover debt service on the PBA Bonds or otherwise "materially and adversely affect the security or interest of the holders of the bond[s] issued under the Bond Resolution." *See, e.g.*, DOE Series R Lease, § 6.06; Treasury Department Lease, § 6.07.

49.     The PBA Leases provide that in the event of conflict between any PBA Lease and an applicable Bond Resolution, the terms of the Bond Resolution control. *See, e.g.*, DOE Series R Lease, § 6.05; Treasury Department Lease, § 6.06.

50.     Each PBA Lease contains an "absolute and unconditional obligation" provision requiring the Lessee to pay "rent" in full at all times and under all circumstances for the

remainder of the lease term, even if the property has been sold or destroyed, including due to the fault of PBA. *See, e.g.*, DOE Series R Lease, Art. V; Treasury Department Lease, § 4.01.

51.     The PBA Leases also contain "Operating Rental" components designed to cause all actual building maintenance and operation expenses to pass through PBA to the Lessees, so that costs of ownership are paid by Lessees in addition to debt service. *See, e.g.*, Treasury Department Lease, §§ 2.01(c), 2.02, 3.03.

52.     These Operating Rentals also cover "fees and expenses of the bond trustees and paying agents and other expenses in connection with the payment of the principal and interest on" the PBA Bonds, illustrating that PBA operates not as a landlord but as, at most, an administrative agent. *Id.* § 3.03.

53.     To the extent a dispute arises under the Leases, it must be resolved by the Governor, whose office controls both the Lessees and the PBA via various appointment powers, without right of appeal to a neutral party. *See, e.g.*, DOE Series R. Lease, § 6.02; P.R. LAWS ANN. 22. § 904; 3 L.P.R.A. App. § 7 (Governor appoints PBA board members).

54.     Upon information and belief, possibly all other PBA Leases contain provisions that are similar in nature to those described above.

55.     These lease provisions demonstrate that the PBA Leases and payments thereon bear no relation to any rental market or use of premises but, instead, are designed to service PBA's debt.

   **D.  The Financing Structure Employed by the PBA Reveals that Its Bonds Are General Obligations of the Commonwealth.**

56.     The Commonwealth has guaranteed the payment of rent under all PBA Leases with departments, agencies, instrumentalities, authorities, and public corporations of the Commonwealth. 22 L.P.R.A. § 916.

57.     The Commonwealth has also guaranteed the payment, when due, of principal and interest on the PBA Bonds.  Act No. 17-1968 of the Puerto Rico Legislative Assembly, as amended.

58.     The PBA Bonds are payable solely from, and secured solely by, (i) the rental of the PBA Facilities financed by the PBA Bonds and (ii) the funds, if any, paid by the Commonwealth under its guaranty of payment of the principal of, and interest on, the PBA Bonds. 1995 Bond Resolution, art. VII, § 703.

59.     Pursuant to the terms of the PBA Lease Agreements, the holders of the PBA Bonds are third-party beneficiaries of the PBA Lease Agreements.  *See, e.g.*, DOE Series R. Lease, § 6.02; Treasury Department Lease, § 6.05.

60.     However, as previously noted, and notwithstanding contractual provisions to the contrary, the Commonwealth pays nearly all of the purported lease obligations to the PBA.

61.     In other words, entities other than the Commonwealth account for a negligible percentage of the PBA's purported lease revenues, and the Commonwealth effectively subsidizes all non-Commonwealth purported lessees.

62.     The effect of these lease provisions and practices is thus that, whether flowing through purported leases or directly from the Commonwealth treasury, the Commonwealth makes the payments on the PBA Bonds, irrespective of any purported operations activities of the PBA.

63.     Credit rating agency reports on the PBA Bonds analyze the perceived creditworthiness and activities of the Commonwealth, not PBA.  *See, e.g.*, Exhibit M, Report, dated June 5, 2012, of Fitch Ratings with respect to the PBA Series U Bonds, available at

https://www.fitchratings.com/site/pr/751662 (last visited and attached printout created April 26, 2019).

64.     The PBA does not rent properties at market rates.  The PBA's only function is to effectuate a debtor-creditor relationship between the Commonwealth and PBA bondholders.

65.     The PBA Bonds are, in all relevant respects, backed by the Commonwealth's full faith and credit and taxing power, not by revenues from any purported Leases or other PBA operations.

66.     This type of financing is a transparent artifice that should be recognized as general obligation borrowing in accordance with its purpose and function.  *See, e.g.*, *Winkler v. State Sch. Bldg. Auth.,* 189 W.Va. 748 (1993); *Martin v. Oregon Building Authority,* 276 Or. 135 (1975); *Scroggs v. Kansas City,* 499 S.W.2d 500, 505 (Mo. 1973); *Ayer v. Commissioner of Administration,* 340 Mass. 586 (1960); *State v. Volusia Cty. Sch. Bldg. Auth.,* 60 So. 2d 761, 761 (Fla. 1952); *State ex rel. Wash. State Bldg. Fin. Auth. v. Yelle,* 47 Wash. 2d 705, 714 (1955); *State ex rel. Pub. Institutional Bldg. Auth. v. Neffner,* 137 Ohio St. 390, 399 (1940); *Reynolds v. City of Waterville*, 92 Me. 292 (1898).

### III.     The Commonwealth Issued the Challenged Bonds in Violation of its Constitutional Debt Limit.

#### A.     The Commonwealth Constitution Proscribes Borrowing in Excess of Ability to Repay, as Evidenced by Historical Tax Revenues.

67.     In 1961, the Constitution was amended to limit the Commonwealth's borrowing on the basis of the amount of debt service the Commonwealth would have to pay relative to its historical revenues (the "Debt Service Limit").

68.     Specifically, Article VI, Section 2 of the Constitution provides that:

no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged shall be issued by the

Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

P.R. LAWS ANN. CONST. art. VI, § 2.

69.     The annual revenues "raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico" are known as the Commonwealth's "internal revenues" and consist primarily of revenues from income taxes, property taxes, sales and use taxes, and excise taxes (subject to certain exceptions). Ex. E at 31.

### B.     PBA Bonds Should Be Included In Debt Service Limit Calculation.

70.     As previously noted, the PBA Bonds are general obligations of the Commonwealth backed by the Commonwealth's full faith, credit and taxing power.

71.     The terms of the PBA Bonds and their underlying leases were disclosed to the public prior to the issuance of the Challenged Bonds.

72.     In calculating the Debt Service Limit, the Commonwealth did not include the $4 billion in PBA Bonds as "money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged."[8]

---

[8] As previously noted, there are approximately $4 billion in face amount PBA Bonds outstanding, including a number of serious not alleged herein to be null and void.

73.     As shown in <u>Appendix 1</u>, had the Commonwealth and its professionals properly accounted for the PBA Bonds prior to issuing the Challenged Bonds, they would have known that the Challenged Bonds were being issued in violation of the Debt Service Limit.[9]

74.     The Challenged Bonds violated the Debt Service Limit.

75.     Moreover, in calculating the Debt Service Limit, the Commonwealth did not include the nearly $425 million of interest to be paid from the proceeds of the 2014 GO Bonds themselves in fiscal years 2014, 2015, and 2016.  *See* Ex. E at 24.

76.     As shown in <u>Appendix 2</u>, had that interest been included in the calculation, the issuance of the 2014 GO Bonds would have been shown to violate the Debt Service Limit, even without including debt service on the PBA Bonds.

77.     Moreover, the Commonwealth used the proceeds of the 2014 GO Bonds in manners that give rise to additional concerns as to the validity of the debt, for instance, the financing of ongoing operational deficits and repayment of debts that were not general obligations of the Commonwealth, such as $342 million in COFINA bond anticipation notes. *See* Ex. E at 8 (regarding risks of deficit financing) and 24 (regarding use of proceeds); *see also* Joint Claim Objection, ¶¶ 91-105 (2014 GO Bonds null and void due to violation of balanced budget constitutional requirement).[10]

---

[9] The Lawful Constitutional Debt Coalition (the "<u>LCDC</u>") has taken the alternative position that, while debt service on the PBA Bonds should not have been included in the future debt service component of the Debt Service Limit calculation, rents paid by the Commonwealth that were used to pay PBA Bond debt service should have been included in the prior payments on guaranteed debt component. *Statement of Position of Lawful Constitutional Debt Coalition Regarding Objection to Claims Filed or Asserted By Holders of Certain Commonwealth General Obligations Bonds*, Case 17-03283-LTS, ECF No. 6180. According to the LCDC, "Debt Service Rentals" paid by the Commonwealth constitute "amounts paid by the Commonwealth . . . for principal and interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth." *Id.* at 4-6.  "Thus," the LCDC argues, "under the plain language of Puerto Rico's Constitution, because the Commonwealth guaranteed the PBA Bonds, the Commonwealth's payments in the prior fiscal year for principal or interest on PBA Bonds should have been included in the determination of the [Debt Service Limit]."  When calculated in this manner, the Debt Service Limit was likewise violated with the issuance of some or all of the Challenged Bonds. *See id.* at 7-8.

[10]     Consistent with the Joint Claim Objection, p. 32 fn. 18, the Oversight Board does not herein take a position with respect to whether any of the Challenged Bonds violate the Balanced Budget Clause as defined and described in the Joint

### IV.   The Challenged GO Bonds Were Null and Void at All Times and Purported Payments Thereon Were Unlawful.

#### A.   The Commonwealth Constitution Forbids Expenditures Related to Purported Borrowings in Violation of Law.

78.   Article VI, § 9 of the Commonwealth Constitution provides that "[p]ublic property and funds shall only be disposed of for public purposes…and pursuant to law."

79.   The Debt Service Limit embodies a public purpose of the Commonwealth to limit the Commonwealth's ability to borrow money on a general obligation basis to amounts that the Commonwealth will be able to repay through its taxation revenues.

80.   Thus, in addition to the fact that the issuance itself violated the Debt Service Limit, any payments on purported borrowings violated section 9 of Article VI of the Commonwealth Constitution.

81.   Similarly, government agencies lacking express statutory authority to issue negotiable bonds to the public may not do so, and any purported bonds issued absent express authority are *ultra vires* and thus null and void.  *See City of Brenham v. German-American Bank*, 144 U.S. 173 (1872); *Rathbone v. Bd. of Comm'rs*, 73 F. 395, 399 (D. Kan. 1896), *rev'd on other grounds*, 83 F. 125 (8th Cir. 1897); *Fullerton v. Cent. Lincoln People's Util. Dist.*, 201 P.2d 524, 529-30 (Or. 1948); *Muscatine Lighting Co. v. Muscatine*, 217 N.W. 468, 471 (Iowa 1928); *Reed v. Cedar Rapids*, 113 N.W. 773, 775 (Iowa 1907).

82.   Parties to purported contracts with the Commonwealth that violate Puerto Rico law forfeit rights to future payment and must return funds already received under the contract. *See Plaza Carolina Mall, L.P. v. Municipality of Barceloneta,* 91 F. Supp.3d 267, 290 (D.P.R. 2015); *E.L.A. v. Cole Velazquez*, 164 D.P.R. 608, 642-43 (2005) (noting that illegal disbursement

---

Claims Objection.  However, the Oversight Board reserves its right to raise this or additional objections to the validity of the Challenged Bonds.

of funds "is intolerable…It is, then, the obligation of the courts to reclaim" such funds); *see also E.L.A. v. Hon. Bernardo Negrón, et al.*, 184 D.P.R. 464 (2012) (Art. VI, § 9 "forces every governmental entity, state and municipal, to safeguard the legitimate disbursement of all public funds").

83.     Moreover and generally, bond obligations purportedly incurred in breach of a government issuer's express authority are void, and any payments thereon deprive legitimate creditors of access to funds for repayment.  *See, e.g.*, *State v. Spring City,* 123 Utah 471, 475 (1955); *State ex rel. Nuveen v. Greer,* 88 Fla. 249, 260 (1924); *Eaton v. Shiawassee Cty.,* 218 F. 588, 591 (6th Cir. 1914); *McCurdy v. Shiawassee Cty.,* 154 Mich. 550, 556 (1908).

84.     Likewise, no other legal or equitable theory permits the Commonwealth to make payments on purported borrowings that violate Puerto Rico Law.  *See CMI CapitalMkt. Inv., LLC v. Municipality of Bayamon,* 410 F.Supp.2d 61, 76 (D.P.R. 2006) (noting potential problems that could arise from the application in Puerto Rico of common law equitable estoppel); *Hatton v. Mun. de Ponce,* 134 D.P.R. 1001, 1010 (1994) (holding that a medical equipment supplier could not recover as unjust enrichment the value of equipment delivered to a municipality where the purchase agreement violated a clear public policy embodied in rules governing municipal contracts); *Morales v. Mun. De Toa Baja,* 119 D.P.R. 682, 692-93 (1987) (holding that common law *actos propios* doctrine was inapplicable where the public policy of protecting public funds and the general welfare of the municipality was implicated); *Mendoza Aldarondo v. Asociacion de Empleados,* 94 D.P.R. 564, 579 (1967) (explaining the "general rule that 'estoppel' cannot arise from acts by government officials or government agents").

85.     In other words, the issuance of the Challenged Bonds in violation of law renders them null and void; as a result, purported holders of such bonds are not entitled to any payments on such bonds, whether or not such payments have already been made.

**B.      Purported Bondholders Did Not Provide Reasonably Equivalent Value in Exchange for Payments of Purported Principal and Interest on the Challenged Bonds.**

86.     Because the Challenged Bonds were null and void, no purported bondholders had a legal right to payment in respect of such bonds.

87.     Put differently, the Commonwealth had no legal obligation to make payments of principal and interest in respect of the Challenged Bonds (the "CB Payments").

88.     Although the Commonwealth did receive certain proceeds of the Challenged Bonds, pursuant to Puerto Rico law, such proceeds could not be lawfully characterized as consideration for any purported payments of principal and interest made by the Commonwealth thereafter.

89.     The Commonwealth received no value in exchange for the CB Payments.

**V.      The Commonwealth Was Insolvent at the Time of the Challenged Transfers.**

90.     The Commonwealth's books and records, from no later than 2012 and continuing to the present, demonstrate that the value of its liabilities have exceeded the value of assets in each fiscal year, and thus also at the time of the CB Payments.

91.     Likewise, the Commonwealth's books and records from at least as early as fiscal year 2010 demonstrate a consistent trend of mounting liabilities and dwindling assets, such that at no point during that period has the value of its assets exceeded its liabilities.

92.     The Commonwealth defaulted on certain general obligations due July 1, 2016.

93.     Moreover, not later than 2012, the Commonwealth had begun failing to appropriate sufficient funds for the operations of several of its instrumentalities and failed to make required deposits on certain pension obligations and pay guaranteed debt.

94.     Furthermore, beginning not later than 2012, the Commonwealth incurred increasingly onerous General Obligation Bond debt that was beyond its ability to repay as it matured.

95.     Likewise, the Commonwealth was unable to pay its debts as they came due at the time of the Transfers.

96.     Beginning not later than 2012, commentators observed that Puerto Rico's debt service requirements were not sustainable, and not later than June of 2015 the Governor of Puerto Rico admitted this was the case.

97.     The Commonwealth defaulted on certain general obligation debt in 2016 as it was unable to pay debts while delivering services at the level and quality required for the health, safety, and welfare of Puerto Rico.

98.     During the course of this proceeding, the Plaintiffs may learn (through discovery or otherwise) of additional avoidable transfers made to the Defendants during the four years prior to the Petition Date.  It is the Plaintiffs' intention to avoid and recover all transfers made by the Commonwealth of an interest of the Commonwealth's property and to or for the benefit of any transferee on account of any Challenged Bonds.  The Plaintiffs reserves their rights to amend this original Complaint to include, without limitation: (i) further information regarding the CB Payments, (ii) additional transfers, (iii) modifications of and/or revisions to the Defendants' names, (iv) additional defendants, and/or (v) additional causes of action (including but not limited to causes of action under 11 U.S.C. §§ 542, 544, 545, 548, and/or 549) (collectively, the

"<u>Amendments</u>"), that may become known to the Plaintiffs at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

**VI.   Notwithstanding Its Lack of Obligation, Puerto Rico Paid Substantial Sums to the Defendants in Respect of Purported Principal and Interest Obligations.**

99.     Notwithstanding its lack of any legal obligation to make the CB Payments, and the lack of value received in exchange therefor, the Commonwealth did make certain CB Payments to purported holders of Challenged Bonds in the two years prior to the Petition Date (the "<u>2-Year Challenged Bond Transfers</u>" to the "<u>2-Year Defendants</u>") and in the four years prior to the Petition Date (inclusive of the 2-Year Challenged Bond Transfers, the "<u>4-Year Challenged Bond Transfers</u>" to the "<u>4-Year Defendants</u>").

100.     Recipients of the 4-Year Challenged Bond Transfers are listed at <u>Appendix 3</u> hereto.

**CLAIMS FOR RELIEF**

**COUNT I**

**28 U.S.C. § 2201(a)**
**Puerto Rico Constitution, Art. VI, § 2**
**(Declaration That Challenged Bonds Were Issued in Violation of Constitutional Debt Limit and Are Null and Void)**

101.     The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

102.     The Plaintiffs incorporate herein by reference the legal arguments contained in the Joint Claim Objection, ¶¶12-132, and the PBA Complaint, ¶¶36-53.

103.     The full faith credit and taxing power of the Commonwealth was pledged for the payment of the PBA Bonds, among other indebtedness.

104.    The full faith credit and taxing power of the Commonwealth was pledged for the payment of the Challenged Bonds.

105.    At all relevant times prior to the issuance of each series of Challenged Bonds, the total of (i) the amount of principal of and interest on Challenged Bonds, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year, and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, exceeded 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

106.    The Challenged Bonds are null and void as a result of this constitutional defect.

## COUNT II

### RETURN OF UNLAWFUL DISBURSEMENTS
### (3 L.P.R.A. § 283h, Puerto Rico Common Law)
### (Against all Defendants)

107.    The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

108.    The Challenged Bonds violated the law of Puerto Rico.

109.    The 4-Year Challenged Bond Transfers to the 4-Year Defendants were disbursements of public funds not authorized by law.  *See* 3 L.P.R.A. § 283h(a).

110.    The 4-Year Challenged Bond Transfers, being public monies disbursed unlawfully, may be recovered.  *See Mun. de Quebradillas v. Corp. de Salud de Lares*, 180 D.P.R. 1003, 1015-16 (2011) (citing similar restrictions on municipal disbursements and noting that holding otherwise "would be leaving public funds in private hands that do not correspond to

them" and citing "public policy of protecting the interests and money of the people against waste, prevarication, favoritism and the risks of non-compliance") (citing *Cancel v. Mun. de San Juan*, 101 D.P.R. 296, 300 (1973)).

111.    The Commonwealth is entitled to recover an amount of cash equal to the aggregate amount of the 4-Year Challenged Bond Transfers from the respective 4-Year Defendants.

## COUNT III

### FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544, 550 and 31 L.P.R.A. §§ 3491-3500)
### (Against the 4-Year Defendants)

112.    The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

113.    Pursuant to 11 U.S.C. § 544(b), the Oversight Board has standing to avoid any obligation incurred by the Commonwealth that is voidable under applicable law by a creditor holding an unsecured claim.

114.    As of the Petition Date, the Commonwealth was indebted on an unsecured basis to various parties pursuant to agreements and conduct governed by, among others, the laws of Puerto Rico.

115.    In the four years prior to the Petition Date, the Debtors made the 4-Year Challenged Bond Transfers to the 4-Year Defendants.

116.    At the time of the 4-Year Challenged Bond Transfers, the Commonwealth was in a state of insolvency.

117.    The 4-Year Defendants knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

118.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

119.    There was insufficient consideration for the Transfers, as the Challenged Bonds were null and void.

120.    Consequently, the Plaintiffs request that the 4-Year Challenged Bond Transfers made to each 4-Year Defendant, or an amount cash equivalent thereof, be returned to the Commonwealth pursuant to 31 L.P.R.A. §§ 3491-3500 and 11 U.S.C. §§544 and 550.

121.    Other than such remedy as may be afforded pursuant to other causes of action alleged herein, the Commonwealth has no remedy other than that provided under 31 L.P.R.A. §§ 3491-3500.

## COUNT IV

### FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544(b), 550 and New York Debtor and Creditor Law §273 and §273-a)
### (Against all Defendants)

122.    The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

123.    As of the Petition Date, the Commonwealth was indebted to various parties on an unsecured basis pursuant to agreements and conduct governed by, among others, the laws of New York.

124.    The 4-Year Challenged Bond Transfers constitute Conveyances as defined by New York Debtor and Creditor Law §270.

125.    The 4-Year Challenged Bond Transfers were not made for fair consideration consistent with New York Debtor and Creditor Law §272.

126.    The Commonwealth made the 4-Year Challenged Bond Transfers at a time when it intended or believed it would incur debts beyond its ability to pay as they matured, or was already insolvent as defined by New York Debtor and Creditor Law § 271(1).

127.    Accordingly, pursuant to New York Debtor and Creditor Law §§ 273 and 278(1)(a)-(b) and Bankruptcy Code sections 544 and 550, the 4-Year Challenged Bond Transfers constitute fraudulent conveyances and should be avoided and recovered.

## COUNT V

### FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544(b), 550 and 26 U.S.C. § 6502(a)(1))
### (Against all Defendants)

128.    The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

129.    As of the Petition Date, the Internal Revenue Service ("IRS") was a creditor of the Commonwealth on an unsecured basis.

130.    The Commonwealth made the 4-Year Challenged Bond Transfers within ten years of the Petition Date.

131.    The Commonwealth did not receive reasonably equivalent value for the 4-Year Challenged Bond Transfers because the Challenged Bonds were null and void.

132.    At the time of the 4-Year Challenged Bond Transfers, the Commonwealth was insolvent or became insolvent as a result of the 4-Year Challenged Bond Transfers.

133.    Accordingly, pursuant to 26 U.S.C. § 6502(a)(1) and Bankruptcy Code sections 544 and 550, the 4-Year Challenged Bond Transfers constitute fraudulent conveyances and should be avoided and recovered.

## COUNT VI

**FRAUDULENT TRANSFER**
**(11 U.S.C. §§ 548 and 550)**
**(Against the 2-Year Defendants)**

134.    The Plaintiffs repeat and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

135.    In the two years prior to the Petition Date, the Debtors made the 2-Year Challenged Bond Transfers to the 2-Year Defendants.

136.    The 2-Year Defendants were initial, immediate and/or mediate transferees of the 2-Year Challenged Bond Transfers.

137.     The Commonwealth had a property interest in the funds transferred to the 2-Year Defendants.

138.    At the time of the 2-Year Challenged Bond Transfers, the Commonwealth was (i) insolvent or became insolvent as a result of the transfers; and/or (ii) intended to incur, or believed or reasonably should have believed that they would incur, debts that would be beyond its ability to pay as such debts matured.

139.    Because the Challenged Bonds were null and void, the Commonwealth had no obligation to make the 2-Year Challenged Bond Transfers and thus disposed of its assets without receiving value in exchange.

140.    At all relevant times, there were actual creditors of the Commonwealth holding allowable unsecured claims.

141.    Therefore, the 2-Year Challenged Bond Transfers should be avoided and recovered pursuant to 11 U.S.C. §§ 548 and 550.

## COUNT VII

### OBJECTION TO CLAIMS
### (11 U.S.C. § 502)
### (Against all Defendants)

142.    The Plaintiffs repeats and re-allege each allegation contained in the preceding paragraphs as if fully set forth herein.

143.    The Defendants are entities from which property is recoverable under 11 U.S.C. § 550.

144.    The Defendants are transferees of transfers avoidable under 11 U.S.C. §§ 544 and 548.

145.    The Defendants have not repaid the amount of the avoidable transfers, or turned over such property to the Commonwealth, for which the Defendants are liable under 11 U.S.C. § 550.

146.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of the Defendants and/or their assignees against the Debtors must be disallowed until such time as the Defendants pay to the Commonwealth an amount equal to the aggregate amount of the transfers for which they are liable under 11 U.S.C. § 550, plus interest thereon and costs.

147.    Pursuant to 11 U.S.C. § 502(j), any and all claims of any Defendant and/or its assignees against the Commonwealth previously allowed by the Commonwealth, must be reconsidered and disallowed until such time as such Defendants pay to the Commonwealth an amount equal to the aggregate amount of the transfers for which they are liable under 11 U.S.C. § 550.

### PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Plaintiffs respectfully request that the Court grant the following relief to the extent not inconsistent:

1) On Count I, entering a judgment declaring (i) that the Commonwealth issued the Challenged Bonds in violation of Article VI, § 2 of its Constitution, and (ii) that as a result the Challenged Bonds are null and void and the Commonwealth had no legal obligation to make payments of purported principal and interest in respect thereof.

2) On Count II, entering a judgment against each of the 4-Year Defendants in an amount equal to the 4-Year Challenged Bond Transfers they received, plus interest thereon.

3) On Counts III, IV and V, entering a judgment against each of the 4-Year Defendants in an amount equal to the 4-Year Challenged Bond Transfers they received, plus interest thereon.

4) On Count VI, entering a judgment against each of the 2-Year Defendants in an amount equal to the 2-Year Challenged Bond Transfers they received and to the extent not redundant in light of relief granted pursuant to Counts II and/or III, plus interest thereon.

5) On Count VII, disallowing claims filed by each Defendant and its successors and assignees until such time as such Defendant pays to the Commonwealth an amount sufficient to satisfy judgments entered in respect of Counts III, IV, and V.

Dated: May 1, 2019
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Edward S. Weisfelner*
BROWN RUDNICK LLP
Edward S. Weisfelner, Esq. (*Pro Hac Vice*)
Angela M. Papalaskaris, Esq. (*Pro Hac Vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
eweisfelner@brownrudnick.com
apapalaskaris@brownrudnick.com

Stephen A. Best, Esq. (*Pro Hac Vice*)
601 Thirteenth Street NW, Suite 600
Washington, D.C. 20005
Tel: (202) 536-1700
sbest@brownrudnick.com

Sunni P. Beville, Esq. (*Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com

*Counsel to the Financial Oversight and
Management Board, acting by and through
the members of the Special Claims
Committee*

and

*/s/ Alberto Estrella*
ESTRELLA, LLC
Alberto Estrella (USDC-PR 209804)
Kenneth C. Suria (USDC-PR 213302)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Financial Oversight
and Management Board, acting by and
through the members of the Special Claims
Committee*

63392183 v3

*/s/ John Arrastia*
GENOVESE JOBLOVE & BATTISTA, P.A
John Arrastia, Esq. (*Pro Hac Vice*)
John H. Genovese, Esq. (*Pro Hac Vice*)
Jesus M. Suarez, Esq. (*Pro Hac Vice*)
Mariaelena Gayo-Guitian, Esq. (*Pro Hac Vice*)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jarrastia@gjb-law.com
jgenovese@gjb-law.com
jsuarez@gjb-law.com
mguitian@gjb-law.com

*Proposed Special Litigation Counsel to the
Official Committee of Unsecured Creditors for
all Title III Debtors (other than COFINA)*

- and -

*/s/ Juan J. Casillas Ayala*
CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq.,
        (USDC-PR 218312)
Alberto J. E. Añeses Negrón, Esq.,
        (USDC-PR 302710)
Israel Fernández Rodriguez, Esq.,
        (USDC-PR 225004)
Juan C. Nieves González, Esq.,
        (USDC-PR 231707)
Cristina B. Fernández Niggermann, Esq.
        (USDC-PR 306008)
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
aaneses@cstlawpr.com
jfernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Local Counsel to Official Committee of Unsecured
Creditors for all Title III Debtors (other than
COFINA)*